# EXHIBIT A

| | CIVIL DOCKET NUMBER (Court Use Only) | | Massachusetts Trial Court |
|---|---|---|---|
| **BUSINESS LITIGATION SESSION (BLS) CIVIL ACTION COVER SHEET** | | | Suffolk Superior Court Business Litigation Session |



| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Commonwealth of Massachusetts | KalshiEX LLC |

| ATTORNEY NAME, FIRM NAME, ADDRESS, PHONE NUMBER, EMAIL ADDRESS, BOARD OF BAR OVERSEERS (BBO) NUMBER | (IF KNOWN) ATTORNEY NAME, FIRM NAME, ADDRESS, PHONE NUMBER, EMAIL ADDRESS, BBO NUMBER |
|---|---|
| Louisa Castrucci (BBO # 692208/louisa.castrucci@mass.gov) Joshua Edlin (BBO # 715110/joshua.edlin@mass.gov) Jared Rinehimer (BBO # 684701/jared.rinehimer@mass.gov) Assistant Attorneys General One Ashburton Place Boston MA 02018; Phone: 617-727-2200 | Andrew Cook Orrick, Herrington & Sutcliffe LLP 2100 Pennsylvania Avenue NW Washington, D.C. 20037 Andrew.cook@orrick.com Phone: 202-339-8597 |

CASE CATEGORY CODE AND CASE TYPE (SEE INSTRUCTIONS)

BLS Case Category Code: __A99 (j.1)__

Case Type: __Violation of sports wagering statute__          Is this a jury case? YES ☐  NO ☑

*At the initial Rule 16 Conference, a Special Tracking Order will be created for this case.*

Please provide a detailed statement of the facts and reasons why this case should be accepted into the Business Litigation Session, including the amount in controversy:

The Commonwealth of Massachusetts, by and through its Attorney General, Andrea Joy Campbell, brings this civil action against KalshiEX LLC ("Kalshi"), for violating G.L. c. 23N, § 5 et seq.

Namely, the Commonwealth alleges that Kalshi, one of the largest prediction markets in the country valued at approximately $2 billion, is offering sports wagering under the guise of "event contracts" to Massachusetts residents without the required licensure from the Massachusetts Gaming Commission in violation of G.L. c. 23N. The foregoing unlawful conduct exposes residents of the Commonwealth to a plethora of harms, including but not limited to, the public health risks associated with compulsive gambling—a clinically recognized behavioral addiction—and disastrous financial losses. For these statutory violations, the Commonwealth seeks damages, civil monetary penalties, injunctive relief, attorneys fees and costs, and any other available relief the Court deems proper.

This case is ripe for the BLS because it involves a government entity asserting claims against a business enterprise regarding the legality of a large portion of its enterprise. Moreover, the complexity of the case will likely require substantial case management.

*If applicable, please identify the case docket number, case name, and county in which there is any related case or cases pending in the Superior Court or any other court.*

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my client(s) with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various dispute resolution methods."

Signature of Attorney of Record: _____          Date: __9/12/25__

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION NO. 2584CV 02525

COMMONWEALTH OF
MASSACHUSETTS,

Plaintiff,

v.

KALSHIEX LLC,

Defendant.

**COMPLAINT**



RECEIVED
SEP 12 2025
SUPERIOR COURT - CIVIL
JOHN E. POWERS, III
CLERK MAGISTRATE

1

# **Table of Contents**

I.    INTRODUCTION ................................................................................................. 3
II.   PARTIES ............................................................................................................ 5
    A.    Plaintiff ...................................................................................................... 5
    B.    Defendant ................................................................................................... 5
III.  JURISIDICTION AND VENUE .......................................................................... 5
IV.   LEGAL BACKGROUND ..................................................................................... 6
    A.    Gambling in the Commonwealth .................................................................. 6
        1.    Sports Wagering Licensure ..................................................................... 7
        2.    The Obligations of a Licensed Sports Wagering Operator ......................... 8
V.    KALSHI'S PREDICTION MARKET PLATFORM ............................................. 11
    A.    Overview and Evolution of Kalshi's Wagers .............................................. 11
    B.    Kalshi's Platform Emulates a Gambling Platform ...................................... 15
        1.    Platform Design Mirrors Gambling Psychology ..................................... 15
        2.    Public Leaderboards, Profiles, and Posts Reinforce Speculation ............ 17
VI.   KALSHI'S SPORTS WAGERS ........................................................................ 21
    A.    Kalshi's Sports Event Contracts Are Sports Wagering under Massachusetts Law ....... 21
    B.    Kalshi's Event Contracts Are "Illegal Gaming" under Massachusetts Law ............... 29
VII.  KALSHI'S MARKETING, ADVERTISING, AND MESSAGING ADMIT IT IS
ENGAGED IN SPORTS WAGERING .......................................................................... 30
VIII. KALSHI'S UNLAWFUL SPORTS EVENT CONTRACTS LACK SAFEGUARDS
FOR RESPONSIBLE GAMBLING REQUIRED BY MASSACHUSETTS LAW .................. 37
IX.   KALSHI'S UNLICENSED SPORTS EVENT CONTRACTS UNDERMINE
MASSACHUSETTS' EFFORTS TO PROTECT ITS RESIDENTS FROM THE HARMS OF
ONLINE SPORTS WAGERING ................................................................................. 39
X.    CAUSE OF ACTION ........................................................................................ 41
XI.   PRAYER FOR RELIEF ..................................................................................... 42

1.      The Commonwealth of Massachusetts, by and through its Attorney General, Andrea Joy Campbell, brings this action against defendant KalshiEX LLC ("Kalshi") for offering sports wagering without a license in violation of G.L. c. 23N, § 5 *et seq.*

## I.      **INTRODUCTION**

2.      The Supreme Judicial Court "has long recognized that the legalization and regulation of gambling are among the Legislature's core police powers . . . ." *Gattineri v. Wynn MA, LLC*, 493 Mass. 13, 20 (2023) (citing *Abdow v. Att'y Gen.*, 468 Mass. 478, 489-90 (2014)).

3.      Until the overturning of the Professional and Amateur Sports Protection Act ("PASPA," 28 U.S.C. § 3701 *et seq.*) in 2018, sports wagering was illegal in most of the United States. *See Murphy v. Nat'l Collegiate Athletic Ass'n¸* 584 U.S. 453 (2018). Since that time, at least 40 states and territories have legalized sports betting. Massachusetts established a legal process requiring a license to offer sports wagering through the internet, including through mobile devices like smartphones. *See* G.L. c. 23N, § 5.

4.      As part of that process, the Massachusetts Gaming Commission (the "MGC" or "Commission") was tasked with establishing a licensing regime. G.L. c. 23N, § 5. Any operator providing sports wagering in Massachusetts must be licensed by the MGC and is subject to stringent requirements to protect the public, such as verifying gamblers' location and age, *see* 205 CMR § 243.01(1)(i) (location), 205 CMR § 248.04 (age); committing to responsible gambling initiatives, *see, e.g.*, 205 CMR § 248.16; financial reporting, *see, e.g.*, 205 CMR § 239.03; reporting suspicious or illegal wagering activity, *see* G.L. c. 23N, § 11(e); and reserve requirements to secure payouts to winners. *See* 205 CMR § 238.12.

5.      Sports wagering is regulated for many good reasons, among them that such wagering has significant public health consequences, such as compulsive gambling—a clinically recognized behavioral addiction—and disastrous financial losses.

6.      Kalshi is violating the Commonwealth's strict sports wagering laws and regulations by offering unlicensed sports wagering to Massachusetts residents.

7.      Kalshi disguises its sports wagering offerings as "event contracts" offered on a "prediction market."

8.      Kalshi's wagers allow a bet on whether a sports-related occurrence will happen. The bettor wins money if they guess correctly and forfeits the wagered cash if they guess incorrectly.

9.      The types of "events" for which Kalshi offers contracts range from elections, pop culture, weather, and—most pertinent here—professional and collegiate sporting events.

10.     Kalshi's sports-related event contracts are sports wagers under Massachusetts laws and regulated by the MGC.

11.     As of May 2025, "[m]ore than three-quarters of Kalshi's trading volume now comes from sports . . . . The figures suggest that Kalshi makes a larger percentage of its money from sports than DraftKings or FanDuel—businesses that are almost synonymous with sports betting in the U.S."[1]

---

[1] Daniel O'Boyle, *Kalshi More Reliant On Sports Than Draftkings Or Fanduel, Data Shows*, INGAME (Updated May 21, 2025), https://www.ingame.com/kalshi-sports-data-trading-volume/.

II.    **PARTIES**

A.    **Plaintiff**

12.    Plaintiff is the Commonwealth of Massachusetts ("Commonwealth"), represented by Attorney General Andrea Joy Campbell, who brings this action in the public interest.

B.    **Defendant**

13.    Defendant KalshiEX LLC ("Kalshi") is a Delaware limited liability company with its principal place of business in New York, New York. Kalshi is a wholly owned subsidiary of Kalshi Inc. Kalshi operates a so-called prediction market through which residents of the Commonwealth can engage in unlicensed gambling under the guise of trading event contracts. This market is an online trading platform through which users may wager on the likelihood of a sports-related occurrence. Kalshi conducts business across the United States, including within the Commonwealth of Massachusetts, where Kalshi makes its services available to residents, markets its platform to potential users, and accepts payments through widely used financial systems accessible by Massachusetts consumers.

III.    **JURISIDICTION AND VENUE**

14.    This Court has jurisdiction over the subject matter of this action under G.L. c. 212, § 4.

15.    This Court has specific personal jurisdiction over Kalshi under G.L. c. 223A, § 3, because, among other things, Kalshi engaged in and continued to engage in business within Massachusetts by offering wagers to Massachusetts consumers on the likelihood of a sports-related occurrence, and because Kalshi's actions and inactions have harmed Massachusetts residents.

16.    Venue is proper in Suffolk County under G.L. c. 223, § 5 as the Commonwealth is the plaintiff.

IV.    **LEGAL BACKGROUND**

A.    **Gambling in the Commonwealth**

17.    With few exceptions, Chapter 271 of the General Laws criminalizes gambling activities as crimes against public policy. Since the early-twentieth century, Chapter 271 has comprised "a complete and comprehensive statutory system designed to eliminate the evil of gambling . . . ." *Commonwealth v. Wolbarst*, 319 Mass. 291, 295 (1946).

18.    The legislature defines "illegal gaming[2]" as "a banking or percentage game played with cards, dice, tiles, dominoes, or an electronic or mechanical device or machine for money, property, checks, credit or any representative of value," unless otherwise authorized as legal gambling which includes, in pertinent part, "sports wagering conducted under chapter 23N." G.L. c. 4, § 7, cl. 10.

19.    Sports wagering became legal in the Commonwealth in 2022. St. 2022, c. 173. Eligibility to accept sports wagers is conditioned on state licensure, which is governed by the MGC; and, once licensed, gaming operators are strictly regulated by the MGC. *See* G.L. c. 23N, 205 CMR §§ 202–258 (the "Sports Wagering Regulations").

20.    General Laws Chapter 23N, § 3 defines "sports wagering" as

> the business of accepting wagers on sporting events or portions of sporting events, other events, the individual performance statistics of athletes in a sporting event or other events or a combination of any of the same . . . . Sports wagering shall include, but shall not be limited to, single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets and straight bets.

21.    "Wager" is defined as "a sum of money or thing of value risked on an uncertain occurrence." G.L. c. 23N, § 3.

---

[2] The terms "gambling" and "gaming" are used herein synonymously. *See Commonwealth v. Theatre Advert. Co.*, 286 Mass. 405, 411 (1934).

22.    A "sporting event" is defined as "a professional sport or athletic event, collegiate sport or athletic event, a collegiate tournament . . . or other event authorized by the" MGC. G.L. c. 23N, § 3. Wagering is statutorily prohibited on "high school and youth sports or athletic events; or a collegiate sport or athletic event involving 1 or more collegiate teams from the commonwealth unless they are involved in a collegiate tournament." G.L. c. 23N, § 3.

23.    Chapter 23N provides that "[n]otwithstanding any general or special law to the contrary, the operation of sports wagering and ancillary activities shall be lawful when conducted" pursuant to Chapter 23N and the Sports Wagering Regulations. G.L. c. 23N, § 2. However, "[a] person shall not engage in any activity in connection with sports wagering in the commonwealth unless all required licenses have been obtained in accordance with this chapter and the rules and regulations of the commission." G.L. c. 23N, § 5(a).

1.    *Sports Wagering Licensure*

24.    To qualify for a sports wagering license, the applicant must undergo an extensive investigation for "suitability" to determine that "each person who has control of the applicant meets all qualifications for licensure." G.L. c. 23N, § 6(d); *see, e.g.* 205 CMR § 215.00 (2023). The MGC's suitability analysis considers the applicant's reputation, financial stability and resources, business acumen, history of compliance with gambling requirements in other jurisdictions, litigation status, and the suitability of its affiliates and associates. G.L. c. 23N, § 6(d).

25.    Applicants for a license must pay $200,000 to cover the costs of the MGC's application processing and suitability investigation. G.L. c. 23N, § 7. Additionally, if granted a license, the licensee must pay to the MGC a licensing fee in the amount of $5 million for a five-year license. G.L. c. 23N, § 6(f).

26.    In addition to the licensing fee, the MGC annually assesses and collects a $1 million fee apportioned among all online-only sports wagering operators, with each operators' contribution calculated based on the operator's respective gross receipts. G.L. c. 23N, § 15(e). These funds are deposited into the Public Health Trust Fund, which the secretary of Health and Human Services administers to support efforts to combat and educate on the problems associated with compulsive gambling, and to support the MGC's research dedicated to understanding the social and economic effects of, and science behind, gambling, G.L. c. 23K, §§ 58, 71, and sports wagering. G.L. c. 23N, § 23.

27.    The MGC levies a 20% excise tax on sports wagering adjusted gross receipts for mobile wagers. G.L. c. 23N, § 14; *see* 205 CMR § 240.00 (2022).

28.    Not only are sports wagering operators rigorously vetted for licensure, but the MGC also licenses vendors and affiliates of the operators. 205 CMR § 234.01(1)(a) (2023). The Commission conducts a similar "suitability" investigation centered on integrity and financial stability before issuing any vendor license. *See generally* 205 CMR § 234.00 (2023).

2.    *The Obligations of a Licensed Sports Wagering Operator*

29.    A sports wagering licensee owes numerous duties to the Commonwealth, including but not limited to paying taxes, prohibiting youth and self-excluded individuals from both its products and advertisements, implementing responsible gambling features, and reporting suspected illegal activity or activity that compromises the integrity or betting outcome of a sporting event.

30.    Sports wagering operators are required to employ "commercially reasonable methods" to prohibit certain persons related to the operator from engaging on the platform, as well as certain persons within a sports governing body from wagering on their own sporting events. G.L. c. 23N, § 11(a).

31.     Sports wagering is restricted to those over 21 years of age in the Commonwealth, G.L. c. 23N, § 13(d), and extensive MGC regulations require operators to protect youth under the age of 21 from sports wagering. *See, e.g.*, 205 CMR § 250.00 (2023), 205 CMR § 256.05 (2025).

32.     A licensed sports wagering operator must employ electronic verification to confirm the identity and age of a user before the user can create an account, 205 CMR § 248.04 (2025), and must limit users to one account. 205 CMR § 248.05(1) (2025).

33.     Licensed sports wagering operators must promote "social responsibility and responsible gaming." G.L. c. 23N, § 4(d)(2). They must "assess, prevent and address problem gaming by an operator's consumers," such as via "comprehensive employee trainings on responding to circumstances in which individuals present signs of gambling addiction." *Id.*

34.     Operators must offer daily, weekly, and monthly deposit and wager limits that specify the maximum amount of funds that a patron may deposit into their sports wagering account or put at risk during a particular timeframe, respectively. *See* 205 CMR § 248.16(1) (2025). A sports wagering operator must allow users to set betting limitations at any time, and prompt users to do so when creating an account, the first time a deposit is made, and the first time a wager is placed. *Id.*

35.     When an individual enrolls in the Voluntary Self-Exclusion Program,[3] a sports wagering operator must not advertise to an enrollee, 205 CMR § 256.07 (2025), or allow an enrollee to hold a sports wagering account while enrolled. 205 CMR § 233.02(1) (2023).

36.     All marketing, advertising, and promotional materials for sports wagering operators must include contact information for the Massachusetts Problem Gambling Helpline

---

[3] The Voluntary Self-Exclusion Program is a statewide program that allows an individual to voluntarily exclude from casino gambling and/or sports wagering for a predetermined amount of time—including for life. *See Voluntary Self-Exclusion*, MASS. GAMING COMM'N, https://massgaming.com/about/voluntary-self-exclusion/ (last visited Aug. 5, 2025).

and any other responsible gambling information required by the MGC for the means of advertising used. *See* 205 CMR § 256.06 (2025).

37. Licensees must immediately report to the Commission—and where applicable, the respective sport's governing body—information that includes abnormal betting activity that may compromise the integrity of a sporting event or its betting outcome (*e.g.*, match fixing). G.L. c. 23N, § 11(e); *see also* 205 CMR § 239.00 (2023).

38. Licensees may only offer the types of wagers that are authorized by the Commission.[4] 205 CMR § 247.01(1) (2025).

39. A licensee's offerings may be limited by request of a sports governing body or associated players association upon a good cause showing that a type, form, or category of wager is "contrary to public policy," "unfair to patrons," or impacts the integrity of the sport, as well as the health and safety of the athletes and their families. 205 CMR § 247.04(1)(c)-(d).

40. Moreover, operators are obligated to immediately report to the MGC any information concerning criminal proceedings commenced against it regarding its operations, as well as any other "suspicious or illegal wagering activity," such as funds derived from illegal activity or used to conceal or launder funds. *See* G.L. c. 23N, § 11(e).

41. To date, the Commission has issued nine licenses to sports wagering operators in the Commonwealth with seven actively operating and two ceasing operations. Kalshi is not one of them.

42. Kalshi has never sought approval or licensure from the MGC to engage in sports wagering.

---

[4] *Sports Wagering Approved Events & Wagers*, MASS. GAMING. COMM'N, https://massgaming.com/about/sports-wagering-in-massachusetts/sports-wagering-approved-events-and-wagers/ (last visited Aug. 22, 2025).

43.     Kalshi has failed to make any effort to demonstrate to the MGC that it meets the requirements for a license.

## V.    KALSHI'S PREDICTION MARKET PLATFORM

44.     Kalshi was co-founded in 2018 by Tarek Mansour and Luana Lopes Lara.

45.     Kalshi is a private technology company that, in its own words, operates a web-based "prediction" market.

46.     From its inception, Kalshi has promoted itself as a novel "financial exchange" through which people could "trade in the domain of every day."[5]

47.     In reality, Kalshi was designed from the outset to appeal to mass-market speculation.

48.     Kalshi allows Massachusetts consumers to place bets on its platform through its website, https://kalshi.com, and through its mobile application ("app") on the Android and iOS (Apple) platforms.

### A.    Overview and Evolution of Kalshi's Wagers

49.     Kalshi allows users to take a monetary position on a real-world event by purchasing "event contracts."

50.      Event contracts are structured as binary options: bettors buy "Yes" or "No" positions on whether an event will occur ("Yes") or will not occur ("No"). They receive a fixed payout if they are correct, and nothing if they are not.

51.     Kalshi describes itself as a prediction market because each contract's price (ranging from $0.01 to $0.99) is determined based on the total volume of "Yes" and "No" wagers

---

[5] *About Kalshi*, KALSHI, https://kalshi.com/about (last visited Aug. 1, 2025).

purchased, reflecting "the collective sentiment of its users regarding the likelihood of an event . . . ."[6]

52.    Kalshi claims this "dynamic pricing model" "directly correlates with the market's perceived probability of a specific event occurring," which provides for "real-time fluctuations in contract prices, ensuring that they accurately reflect the consensus opinion of the market participants."[7]

53.    As the perceived likelihood of a "Yes" outcome increases (*i.e.* more people have purchased the "Yes" option in an event contract), the corresponding "Yes" contract price increases. Conversely, the contract price for "No" will increase as the perceived likelihood of a "No" outcome increases, and the contract price for "Yes" will fall.

54.    Once the event resolves, Kalshi settles contracts at $1 for the correct outcome and $0 for the incorrect one.

55.    For example, wagering on 100 "Yes" event contracts for a certain event to take place at a cost of 30 cents each ($30 total)—plus any applicable transaction fee—that, in fact, occurs would result in payout of $1 per contract, or $100 (netting $70). If incorrect, the original $30 is lost.

56.    For most wagers, Kalshi charges a varying transaction fee, charging more for the most uncertain events. That is, $0.50 wagers have the greatest fees, amounting to approximately 1.75 cents per contract.[8]

---

[6] *How are prices determined?*, KALSHI HELP CTR., https://help.kalshi.com/markets/markets-101/how-are-prices-determined (last visited Aug. 1, 2025)).
[7] *Id.*
[8] *Kalshi Fee Schedule*, KALSHI, https://kalshi.com/docs/kalshi-fee-schedule.pdf (last updated July 8, 2025).

57.     Bettors deposit funds into their Kalshi account and use those funds to wager on event contracts. Any return on a successful wager will remain in the bettor's Kalshi account until they choose to withdraw. Kalshi charges a fee for certain deposit and withdrawal methods.

58.     Kalshi matches bettors on opposite sides of the event contract (the "yes" and the "no") so that the combined investment from both bettors equals $1.

59.     If the price changes, bettors may "sell" their wager before the event takes place.

60.     Kalshi's affiliated entity, Kalshi Trading LLC, fills a role similar to that of the house in a classic gambling operation, by acting as a market maker on its platform. It supplies liquidity by placing both buy and sell orders for event contracts, ensuring that bettors can wager at nearly all times. It takes opposing positions, absorbs imbalances in bettor demand, and profits from price movements.  For example, suppose Kalshi offers a contract asking, "*Will the Boston Red Sox win their game on Friday?*" A bettor might want to wager on 100 "Yes" shares at 65 cents each, expecting the Red Sox to win. But if there are not enough other bettors willing to sell "No" shares at that price, Kalshi Trading steps in and buys the "No" shares.

61.     Kalshi also has an affiliated clearinghouse under common ownership called Kalshi Klear LLC that finalizes and settles event contract wagers. Kalshi Klear is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event is resolved. It functions entirely within Kalshi's corporate structure and does not serve as an independent intermediary. This arrangement allows Kalshi to control each stage of the wager Kalshi writes the rules for the contract, determines the basis for settlement, and oversees the payment process.

62.     Kalshi's use of its own clearing agent reveals that the company is not merely providing a platform for third-party trading. It is administering a closed-loop wagering system, where it creates the games, handles the bets, and pays out the winners.

63.     The types of event contract wagers are numerous, and Kalshi keeps adding more. Examples include whether Tottenham or Manchester United will win the Europa League Championship, whether the New England Patriots or the New York Giants will win their next game, and who will win the Women's Tennis Association tournament. In August and September of 2025, Kalshi expanded its offerings to include bets on events such as the number of touchdowns a given player will score in a game, how many points a certain team will win by, the overall total score in a game, and bets on combinations of different sports outcomes. In each case, the bettors' return is determined entirely by an outcome outside their control.

64.     Kalshi formally launched its platform in July 2021 with event contracts focused on topics like inflation, Consumer Price Index, unemployment, and macroeconomic benchmarks. These initial offerings were framed in financial terms, but structured and priced like bets. Each contract allowed users to take a position for or against a particular outcome for a fixed return.

65.     In October 2024, Kalshi expanded into political event contracts. Users were invited to bet on which party would control Congress, whether a presidential candidate would win a swing state, or the margin of victory in a presidential race. These political contracts were presented as opportunities to profit from "civic knowledge," but their mechanics (binary outcomes, fixed payouts, speculative pricing) are the same as those that comprise its sporting event contracts.

66.     As described further *infra*, in January 2025, Kalshi began to offer sports wagering contracts.

14

**B.      Kalshi's Platform Emulates a Gambling Platform**

1.      *Platform Design Mirrors Gambling Psychology*

67.      From the start, Kalshi's offerings have mirrored a digital gambling experience.

68.      Kalshi's platform employs behavioral design mechanisms drawn from gambling psychology, including features that encourage impulsive engagement, exploit award anticipation, and diminish users' perception of financial risk.

69.      For example, potential payouts are presented in bright green font, a color that signals safety and correctness, to emphasize the attention to the profits. In contrast, cost and odds appear in standard black text, diminishing their visual prominence. Moreover, Kalshi only represents the potential outcome upon the purchase of $100 worth of a "Yes" or "No" contract. This interface design subtly encourages high-risk transactions by emphasizing reward while obscuring risk.



*Figure A: A screen capture of Kalshi's website on May 21, 2025.*

70.    Each event contract webpage has an "Ideas" tab and "Activity" tab. The former invites users to post their "prediction" and allows them to interact with other user's posts, including replying, liking, bookmarking, and sharing with others. The latter tab shows the number of purchased and sold "Yes" and "No" contracts updated in real time.



*Figure B: A screen capture taken on August 5, 2025, of the Activity tab showing real-time market activity on wagers for the Houston vs. Miami major league baseball ("MLB") game scheduled for August 5, 2025.*

71.    Kalshi also offers a continuously updating ticker tape of market activity and a "people are also buying" on the event contract wager page before placing a wager in addition to a "people also bought" prompt immediately after users place a wager, sustaining real-time stimulation and encouraging further speculation without pause. These features mirror known psychological triggers of gambling behavior and are engineered to increase user retention and transaction volume.

72.    This uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms, modeled after operant conditioning and slot machine dynamics, can bypass rational evaluation and contribute to excessive financial risk-taking.

2.    *Public Leaderboards, Profiles, and Posts Reinforce Speculation*

73.    Kalshi uses public leaderboards to rank its bettors, based on profits and volume on a daily, weekly, monthly, and all-time basis. The leaderboards encourage competition and social comparison for those who opt in.

74.    The leaderboard rankings, displayed with usernames, avatars, and performance stats, mimic leaderboards utilized in video games and other platforms such as fantasy contests and social casinos, and encourage users to chase short-term gains.

75.    There is also a countdown clock in the top right corner appearing in blue that reflects the remaining time for the time-limited leaderboards, as well as a button to "Join" either the profit or volume leaderboards, respectively. These features only serve to instill further incentive and pressure for users to appear on the leaderboard.

76.    The leaderboards serve no market purpose; instead, they promote repeated high-risk behavior by rewarding speculative successes with community recognition.



*Figure C: A screen capture taken on July 18, 2025, of the Kalshi "daily" leaderboard.*

77.     User profiles add another layer to Kalshi's encouragement of engagement and speculation. Bettors may create a profile with a nickname, profile picture, and description to "interact with other traders."[9] These profiles may publicly display detailed wagering metrics, including potential payouts, cumulative profit, total volume transacted, and the number of wagers made, depending on the user's privacy setting. Making these features public allows the bettor to compete on the leaderboard. If made public, these figures appear prominently beneath

---

[9] *Kalshi Ideas Profile*, KALSHI HELP CTR., https://help.kalshi.com/account/kalshi-ideas-profile (last visited Aug. 5, 2025).

each bettor's profile name and avatar, alongside a timeline of their recent transactions and posts, replies, and "likes" (*i.e.* their interactions with other Kalshi users) on the Kalshi platform.



*Figure D: A portion of a screen capture taken on August 7, 2025, of a redacted Kalshi profile page displaying the user's posted wager on a baseball game. The wager resulted in a payout and received two replies (indicated by the speech bubble) and three "likes" (indicated by the heart).*

78.     Bettors are encouraged to post their "prediction" on the event contract page under the "Ideas" tab, which facilitates a messaging function for bettors to engage with each other. Bettors can reply, like, bookmark, and share other user's posts.

79.     User profiles serve as performance dashboards that encourage bettors to compete, compare, and signal success. The interface reinforces speculative behavior through design choices modeled on gambling platforms, including rapid trade cycling, reward anticipation, and mechanisms known to trigger compulsive engagement loops.



*Figure E: A screen capture taken on August 5, 2025, of a redacted Kalshi profile page prominently displaying the user's Kalshi statistics and below the user's "Top Categories" of purchased event contracts showing profits (in green) and losses (in red).*

80.     Kalshi makes its contract wagers freely accessible to the public in the United States through its website and its mobile apps, including in Massachusetts.

81.     Kalshi does not even attempt to comply with Massachusetts' or any other state's sports wagering laws.

82.     Although Kalshi addresses the "numerous risks associated with trading on Kalshi" in its membership agreement,[10] no such disclaimers can be found on the public-facing wager

---

[10] *Kalshi Membership Agreement*, KALSHI, https://kalshi.com/docs/kalshi-member-agreement.pdf (last visited Aug. 22, 2025).

pages. There is a risk warning that appears at the bottom of Kalshi's homepage; however, it is difficult to navigate to when scrolling down, as the homepage automatically and continuously updates with other available wagers.

## VI.    KALSHI'S SPORTS WAGERS

83.    On January 23, 2025, Kalshi introduced sports-related wagers, including those on Super Bowl winners and March Madness outcomes.

84.    From January to June of 2025—approximately the first five months Kalshi offered sports event contracts—bettors wagered more than $1 billion on 3.4 million sports wagers.

85.    More specifically, sports event wagers comprised approximately 70% of Kalshi's trading volume between February 25, 2025, and May 17, 2025, which increased to 75% from March 18, 2025 onwards—Kalshi's first day offering single-game March Madness markets. Kalshi made more from sports wagers than licensed sports wagering platforms Draftkings or Fanduel over the course of the same February through May timeframe.

86.    As of June 2025, Kalshi has roughly two million users and is available nationwide.

87.    On information and belief, Kalshi is valued at over $2 billion.

### A.    Kalshi's Sports Event Contracts Are Sports Wagering under Massachusetts Law

88.    Despite Kalshi calling its product "event contracts," consumers are placing wagers on the outcome of sporting events.

89.    Kalshi's sporting event contracts constitute "sports wagering" because Kalshi is engaged in "the business of accepting wagers on sporting events." G.L. c. 23N, § 3.

90.     Kalshi's offering meets the definition of a "wager" under Chapter 23N because a user risks a sum of money (*i.e.* the price of the contract) on an uncertain occurrence in a sporting event (*i.e.* the position taken on the event contract) for the chance to win money if the event takes place (*i.e.* a prize). *See* G.L. c. 23N, § 3.

91.     Kalshi's sporting event contracts concern a "professional [and collegiate] sport or athletic event[]," which constitutes a "sporting event." G.L c. 23N, § 3.

92.     Accordingly, Kalshi's sport events contracts are wagers on uncertain outcomes, structured and operated in a manner that meets the legal definition of sports wagering under Massachusetts law.

93.     Moreover, Kalshi's wagers bear resemblance to wagers that are explicitly identified by c. 23N as sports wagering.

94.     For example, one of Kalshi's offerings display a binary option of a winner of a contest, the perceived likelihood of either option winning, and a price on either option determined by that perceived likelihood.

95.     Kalshi pays out to the winner and nothing to the loser.

96.     Such bets are moneyline wagers, which c. 23N, § 3 identifies as one of the particular types of bets defined as "sports wagering."

97.     For sports wagering operators that are licensed in Massachusetts, moneyline wagers display binary options of the winner of a contest, noting odds and a higher payout for the option that is less likely to occur.



*Figure F: A portion of a screen capture taken on August 27, 2025, of licensed sports wagering operator Fanduel's website offering National Football League ("NFL") wager offerings with Moneyline, binary option, wagers represented in "Money" column.*



Figure G: A portion of a screen capture taken on August 27, 2025, showing that the purchase of $100 for a "Yes" contract that South Florida will win against Boise St. in an NCAA football game, which Kalshi determines the "odds" of happening are 33%, would result in a $304 payout if this happens.



Figure H: A portion of a screen capture taken on August 26, 2025, showing that the placing of a $100 wager that South Florida will win against Boise State, which licensed sports operator Fanduel, listed at +180 odds, would result in a $180 payout if this happens.

24

98.     In August 2025 and September of 2025, Kalshi's expanded its sports-contract offerings by launching new wager types that also resemble other wagers explicitly defined as "sports wagering" under c. 23N.

99.     One new wager type is framed as follows: "[w]ill <team> win <game> by <above/below/between/exactly/at least> <count> points?"[11] This is a point spread bet, which is a bet on the difference in score between teams in a game. Point spread bets are explicitly included in the definition of sports wagering. G.L. c. 23N, § 3. In fact, Kalshi titles the contract "FOOTBALLSPREAD."[12]

100.    Another new wager type asks "[w]ill <game> have <over/under> <count> points in <time period> of <game>?"[13] This is an "over/under" wager, which is a bet on whether the total amount of points scored in a game is over or under a specific amount. Over/under bets are explicitly included in the definition of sports wagering. G.L. c. 23N, § 3.

101.    A third new wager type asks the bettor "[w]ill <player/team> score <first/last/any/count> touchdown(s) in  of <game>?"[14] This structure resembles a proposition bets, which are bets on specific events that are not the outcome of a game. Proposition bets are explicitly included in the definition of sports wagering. G.L. c. 23N, § 3.

---

[11] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Aug. 18, 2025) https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08182529012.pdf (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will <team> win <game> by <above/below/between/exactly/at least> <count> points' Contract").
[12] *Id.* at 8.
[13] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Aug. 18, 2025) https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08182529006.pdf (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will <game> have <over/under> <count> points in <time period> of <game>?' Contract").
[14] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Aug. 18, 2025) https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08182529000.pdf (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will <player/team> score <first/last/any/count> touchdown(s) in  of <game>?' Contract").

102.     In September of 2025, Kalshi further introduced the following wager to its portfolio: "Will <outcomes> occur in <events>?"[15] designed for bets on multiple "components" which, if each prevail, "will pay out the product of the payouts for each <component>, as dictated by each corresponding <rule>, rounded down to the nearest cent."[16] This structure is a parlay, which is a bet on whether a combination of different events will occur. Parlays are explicitly included in the definition of sports wagering. G.L. c. 23N, § 3.

---

[15] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC at 1 (Sept. 2, 2025) https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf (regarding "KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the 'Will <outcome> occur in <events>?' Contract").
[16] *Id* at 9.



*Figure I: A portion of a screen capture taken on September 5, 2025, showing the various wager types available on Kalshi's platform regarding the Kansas City at Los Angeles C scheduled for September 5, 2025, at 8 P.M.*



*Figure J: A portion of a screen capture taken on September 5, 2025, showing the various wager types available on FanDuel's platform regarding the Kansas City at Los Angeles C scheduled for September 5, 2025, at 8 P.M.*

103.    Moreover, Kalshi's wagering structure, including the ability to sell wagers to other users and the matching of buyers on opposite sides of a contract constitutes "exchange wagering," which is explicitly included in the definition of sports wagering. G.L. c. 23N, § 3. Exchange wagering allows bettors to bet or trade against one another rather than a "house".

104.    In addition, just like licensed sports wagering operator platforms, Kalshi offers the ability to wager on sporting events while those events are taking place.

**B.** **Kalshi's Event Contracts Are "Illegal Gaming" under Massachusetts Law**

105.    In addition to satisfying the statutory definition of "sports wagering" under Chapter 23N, Kalshi's event contracts fall within the statutory definition of "illegal gaming" under Massachusetts Law.

106.    Kalshi's contracts constitute a "percentage game" played on an electronic device (*i.e.,* a computer or mobile device) for money. *See* G.L. c. 4, § 7, cl. 10.

107.    Kalshi's event contracts further satisfy all three elements of illegal gaming, generally referred to as an illegal lottery, under Massachusetts law: prize, consideration, and chance. *See Commonwealth v. Stewart-Johnson*, 78 Mass. App. Ct. 592, 594 (2011). First, users stake real money (consideration) to purchase binary contracts with the hope of receiving a monetary return (a prize) if they correctly predict the outcome (chance) of a future sports event. Most critically, chance predominates over skill in determining the outcome of these contracts. While users may conduct research or follow trends, they cannot influence or control the actual result of a sporting event. The event turns on external, uncertain factors, such as player performance, officiating, weather, and injuries. These factors are unknowable and beyond the bettor's control.

108.    Massachusetts is not alone in determining that Kalshi is engaged in illegal gaming. Multiple state gambling regulators have issued cease-and-desist orders to Kalshi for offering unlicensed sports wagering, including in Nevada, New Jersey, Maryland, Ohio, Illinois, Montana, and Arizona.

VII.    **KALSHI'S MARKETING, ADVERTISING, AND MESSAGING ADMIT IT IS ENGAGED IN SPORTS WAGERING**

109.    Kalshi advertises to Massachusetts consumers through its website and mobile apps, in addition to advertising on streaming videos and television (especially during or surrounding sports broadcasts), and advertising through social media.

110.    Prior to March 2025, Kalshi referred to itself in advertisements as a "sports betting platform" that offered "bets" on various real-world events.

111.    Kalshi's own "Press" page on its website currently includes various news stories where Kalshi and Kalshi's CEO refer to its offerings as "bets."

112.    As recently as 2024, on mobile application stores, such as the "App Store" for iOS (Apple) devices and "Google Play" for Android devices, Kalshi listed its app alongside the tagline "Kalshi: Bet on the headlines." [17]

113.    Kalshi's "App Store" thumbnails (i.e., small images featuring the app) have made statements such as "You can bet on that" and "Legal in 50 states."

114.    Kalshi has at least two Instagram accounts accessible to Massachusetts users: @kalshi_official and @kalshisports.

115.    On the @kalshi_official Instagram account, Kalshi advertises event contracts through posts on its profile. Numerous posts describe event contracts by using terms such as "odds."

---

[17] Kalshi now describes itself as a "regulated exchange dedicated to trading" that allows people to "trade" to offset risks and "hedge against future uncertainties" where "investments [are] directly tied to the outcome of specific events." *Why Kalshi contracts over other asset classes?* KALSHI HELP CTR., https://help.kalshi.com/kalshi-101/why-kalshi-contracts-over-other-asset-classes (last visited Aug. 6, 2025).



*Figure K: Snippet from @kalshi_official Instagram account as of May 21, 2025.*

116.    On the @kalshisports Instagram account, Kalshi dedicates its posts to current sports events and sports-related pop culture, using memes and trending topics to entice consumers to enter into one of Kalshi's sports event contracts.

31



*Figure L: Snippet from @kalshisports Instagram account as of May 21, 2025.*

117.     As recently as January 23, 2025, Kalshi has posted advertisements and published posts on Instagram referencing "betting" on Kalshi.



*Figure M: Example of advertisement from @kalshi_official Instagram account.*

118.    Kalshi's Instagram advertisements have made statements including "The First Nationwide Legal Sports Betting Platform" and "You can now bet on sports in all 50 states with Kalshi," evidencing Kalshi's strategy to operate and market like a gambling entity rather than a risk management platform.



*Figure N: Example of advertisement from @kalshi_official Instagram account.*

119.    At least one of Kalshi's Instagram posts, in October 2024, touted how Kalshi was higher ranked than FanDuel, a Massachusetts-licensed sports wagering and fantasy sports operator, in the "Top Apps" on the Apple "App Store."

120.    Kalshi has an active TikTok account, @kalshi_markets, that is accessible to Massachusetts users.

121.    Kalshi's TikTok account includes content similar to that of its Instagram accounts, advertising its various event contracts through videos and memes that represent political, pop culture, and sports-related current events.



*Figure O: Example of a frame in a video posted on @kalshi_markets TikTok account.*

122.    Kalshi has a Discord page (or "server"). Discord is a platform that allows users with common interests to communicate with one another. Kalshi describes its Discord server as a place to "talk about market ideas, answer questions, and provide a space for developers to discuss Kalshi's powerful API" in real time and encourages users to join.[18]

123.    The Discord server has a channel (i.e., conversation) dedicated to sports where users share the sports event contracts purchased, successful outcomes, and speculate future purchases.

---

[18] *Connect with Us*, KALSHI HELP CTR., https://help.kalshi.com/connect-with-us (last visited Aug. 7, 2025).



*Figure P: A screen capture taken on July 22, 2025, showing a user posting their "Order completed" page within a designated "Sports" channel on Discord upon wagering in favor of Detroit winning against Pittsburgh. The username has been redacted.*

124.    Kalshi has had, or currently has, multiple Facebook profiles and pages that are accessible to Massachusetts users, including "Kalshi – TradeTheHeadlines," "Kalshi – Trade Event Contracts," "TradeWithKalshi," and "KalshiEventFutures."

125.    While Kalshi's advertising efforts have mostly been online, it recently reached a television viewership when it created a commercial completely from artificial intelligence that was aired during Game 3 of the NBA Finals in June 2025, where fictitious individuals were shouting their picks as to who would win the NBA championship. Other fictitious individuals

shouted gambling phrases such as "We're in Florida asking people what they put their money on!" and "I'm all in."

126.    Kalshi now describes its platform as allowing consumers to "trade" on event contracts rather than "betting," potentially leading consumers to believe they are not engaging in gambling. This shift in framing took place after March of 2025, after Kalshi received its first of many cease-and-desist letters from state gaming regulators.

127.    Kalshi also offers "trading incentives" or "bonuses" to its users.

128.    FanDuel and DraftKings also both offer programs that reward account holders based on their wager volume. Both reward programs categorize account holders into tiers based on predetermined wager volume thresholds and award account holders different amounts of credits or bonuses, or other perks, based on their tier.

129.    The availability of Kalshi's contracts are not limited to Kalshi's platform, but are also available on Robinhood, a stock-trading platform accessible via app and webpage. The two platforms have partnered since March of 2025 to offer Kalshi wagers.

130.    Approximately $1 billion worth of Kalshi wagers were traded on Robinhood during the second quarter of the year, which likely generated an estimated $10 million in revenue for Kalshi.

131.    On August 19, 2025, Kalshi announced that it will offer event contracts on college and NFL football.

**VIII.    KALSHI'S UNLAWFUL SPORTS EVENT CONTRACTS LACK SAFEGUARDS FOR RESPONSIBLE GAMBLING REQUIRED BY MASSACHUSETTS LAW**

132.    While Kalshi offers wagers on event contracts, including sports-related event contracts, Kalshi provides little to no safeguards to educate users about financial responsibility,

risks of losing money, and have only recently implemented minimal responsible gambling tools mandated of licensed sports wagering operators to address addiction.

133.    Kalshi allows anyone who is at least 18 years old to create an account and wager on event contracts. Upon signing up for an account, users enter such personal information as their date of birth and social security number and only may be asked to upload an identifying document (*i.e.* a passport or driver's license) for further verification.

134.    Kalshi also markets to, and facilitates use of its platform by, users under the age of 18.  These users may access a demonstration version of the Kalshi platform, which "offers users the ability to interact with the platform using mock funds, allowing for a safe and risk-free experience" upon inputting "fake information" to sign up for this version.[19]

135.    Kalshi does little to warn bettors about the real risk of losing money given its absolute yes-or-no payout structure.

136.    Prior to March 2025, Kalshi did not provide any self-limiting options to Massachusetts bettors, such as maximum deposits, maximum wagers for a particular contract, or the maximum wager on a particular position over a particular time span.

137.    As of March 2025, Kalshi introduced a "Personalized Funding Cap," which allows bettors to set only a maximum deposit during each calendar month for all future deposits.

138.    Prior to March 2025, Kalshi did not provide any option for a bettor to set a "cool-off" period, that is, a timeframe self-selected by the bettor during which they would not be able to place wagers.

---

[19] *Demo Account*, KALSHI HELP CTR., https://help.kalshi.com/account/demo-account (last visited Aug. 8, 2025).

139.    Kalshi does not provide any resources or information to a bettor who is seeking responsible gambling messaging or help for financial loss or gambling addiction, such as the Massachusetts Problem Gambling Helpline.

140.    Kalshi does not have programs that intervene to promote responsible gambling when a bettor's pattern of wagering indicates potential problem gambling behavior.

141.    Prior to March 2025, Kalshi did not offer voluntary self-exclusion options or similar protections to bettors.

142.    Even if a bettor voluntarily self-excludes from Kalshi, there is no indication whether that bettor would automatically be removed from all Kalshi marketing lists.

## IX.    KALSHI'S UNLICENSED SPORTS EVENT CONTRACTS UNDERMINE MASSACHUSETTS' EFFORTS TO PROTECT ITS RESIDENTS FROM THE HARMS OF ONLINE SPORTS WAGERING

143.    Gambling has serious public health risks that may lead to harm to a gambler's financial, economic, emotional, and physical well-being, as well as the well-being of their families and communities.

144.    The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM 5-TR") categorizes gambling disorder as an "addictive disorder," making it the only defined behavioral addiction in that manual. The disorder includes symptoms such as an increased tolerance for gambling (*i.e.,* more money wagered over time); repeated unsuccessful efforts to control, reduce, or stop gambling; and lying or concealing the extent of gambling involvement.

145.    A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. . . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online

sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems."[20]

146.    "[N]ot only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play. These effects are particularly pronounced among financially constrained households."[21]

147.    Research further shows that "legalized sports betting amplifies emotional cues, as evidenced by increased [intimate partner violence] when a fan's home team unexpectedly loses."[22]

148.    Several US studies report that those with gambling disorder had the highest suicide rate of any addiction disorder, with one in five having attempted suicide.

149.    In addition, experts suggest that the pressures that sports betting puts on college athletes may be a contributing factor to the rise in suicidality for this group.

150.    Sports betting is attracting younger participants, too. More than 40% of high schoolers and middle schoolers had gambled in the last year — from scratch tickets to sports — according to a 2021 survey of Massachusetts youth conducted by state education and health departments.

---

[20] *A Review of Sports Wagering & Gambling Addiction Studies Executive Summary*, NAT'L COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/wp-content/uploads/2023/09/Sports-gambling_NCPGLitRvwExecSummary.pdf (last visited Sept. 5, 2025).

[21] Scott R. Baker et al., *Gambling Away Stability: Sports Betting's Impact on Vulnerable Households*, Oct. 21, 2024, https://mitsloan.mit.edu/sites/default/files/inline-files/Session3_Paper3_Gambling%20Away%20Stability.pdf.

[22] Kyutaro Matsuzawa & Emily Arnesen, *Sports Betting Legalization Amplifies Emotional Cues & Intimate Partner Violence* (Oct. 30, 2024) available at https://ssrn.com/abstract=4938642 or http://dx.doi.org/10.2139/ssrn.4938642.

151.    In Massachusetts, residents are conducting internet searches relating to "gambling addiction" at a significantly higher rate than previously expected following the legalization of sports betting in the Commonwealth, which is "highly unlikely to be due to chance."[23]

152.    Approximately two million adults in the U.S. (1% of the population) and over 139,600 individuals (2%) in Massachusetts experience gambling problems, with another 4-6 million (2-3%) demonstrating problematic gambling behaviors.

153.    Kalshi is facilitating gambling in Massachusetts without all required responsible gambling features mandated for licensed sports wagering operations, and without any oversight by the MGC as to whether its measures are effective, which is exposing residents of the Commonwealth to gambling addiction without few safeguards.

## X.    CAUSE OF ACTION

### COUNT ONE

### Violation of G.L. c. 23N
*Conducting Sports Wagering without a License in the Commonwealth*

154.    Plaintiff, the Commonwealth, repeats and realleges the foregoing paragraphs and incorporates them herein by reference.

155.    Pursuant to G.L. c. 23N, "[a] person shall not engage in any activity in connection with sports wagering in the commonwealth unless all required licenses have been obtained in accordance with this chapter and the rules and regulations of the [MGC]." G.L. c. 23N, § 5(a).

156.    Section 4(g) of G.L. c. 23N provides that the MGC "may request that the attorney general bring an action to enforce [c. 23N] or any rule or regulation of the commission by civil action or petition for injunctive relief," and the MGC has so requested in this matter.

---

[23] Atharva Yeola, et al., *Growing Health Concern Regarding Gambling Addiction in the Age of Sportsbooks*, JAMA INTERNAL MED. (Feb. 17, 2025) https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2830019.

157.    Kalshi qualifies as a "person" under G.L. c. 23N, as it is a corporation. *See* G.L. c. 23N, § 3.

158.    Kalshi is in the business of accepting wagers, defined as "a sum of money or thing of value risked on an uncertain occurrence" on amateur and professional sporting events in the form of selling sporting event contracts. *See* G.L. c. 23N, § 3.

159.    Kalshi's sporting event contracts constitute sports wagering as defined by G.L. c. 23N, § 3 and applicable regulations.

160.    Kalshi does not have a license to engage in activity in connection with sports wagering from the MGC pursuant to Chapter 23N.

161.    Accordingly, Kalshi is engaged in sports betting without a license issued by the MGC in violation of G.L. c. 23N.[24]

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commonwealth of Massachusetts respectfully requests that the Court grant the following relief:

A.    Determine that Defendant engaged in sports wagering without a license in violation of G.L. c. 23N, § 5 and the regulations promulgated thereunder;

B.    Award monetary relief in an amount to be determined at trial

C.    Permanently enjoin Defendant from engaging in sports wagering without a license in violation of G.L. c. 23N; and

D.    Award any and all other additional relief as the Court may determine to be just and proper.

---

[24] *Sports Wagering Licensees*, MASS. GAMING COMM'N, https://massgaming.com/about/sports-wagering-in-massachusetts/sports-wagering-licensees/ (last visited July 8, 2025).

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS
By its Attorney
ANDREA JOY CAMPBELL
ATTORNEY GENERAL

By: /s/

Louisa E. Castrucci, BBO # 692208
Joshua Edlin, BBO # 715110
Alda Chan, BBO # 705204
Jared Rinehimer, BBO # 684701
M. Patrick Moore, BBO # 670323
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts 02108

617-963-2848 / louisa.castrucci@mass.gov
617-963-2905 / joshua.edlin@mass.gov
617-963-2525 / alda.chan@mass.gov
617-963-2594 / jared.rinehimer@mass.gov
617-963-7491 / pat.moore@mass.gov

DATE: September 12, 2025